UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRANCE MOKHATEB RAFII,<br><br>　　Plaintiff,<br><br>　　v.<br><br>THE ISLAMIC REPUBLIC OF IRAN,<br><br>and<br><br>THE IRAN MINISTRY OF<br>INFORMATION AND SECURITY,<br><br>　　Defendants. | Civil Action No. 01-850 (CKK) |

**MEMORANDUM OPINION**
(October 25, 2005)

Currently before the Court are two issues: (1) the potential vacatur of Plaintiff's December 2, 2002 judgment entered in this case, in light of principles announced in the District of Columbia Court of Appeal's decision in *Cicippi-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004); and (2) the potential quashing of Plaintiff's remaining writs of attachment against certain properties that allegedly fall under the category of "blocked assets" for the purposes of the Terrorism Risk Insurance Act ("TRIA"), Pub. L. No. 107-297, 116 Stat. 2322 (Nov. 26, 2002). Upon a searching examination of these issues and the extensive briefing before it, the Court concludes that (1) it shall <u>not</u> exercise its limited discretion under Federal Rule of Procedure 60(b) to vacate the final judgment entered in favor of Plaintiff, despite the fact that subsequent decisions by the D.C. Circuit and courts within the United States District Court for the District of Columbia have undermined the legal reasoning employed by this Court in

rendering its final judgment in favor of Plaintiff; and (2) it shall grant in full the United States's motion to quash all of Plaintiff's remaining writs of attachment.

## I: BACKGROUND

On December 2, 2002, this Court entered a default judgment, pursuant to 28 U.S.C. § 1605(a)(7), in favor of Plaintiff, France Rafii, and against the Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS") for the damages she suffered resulting from the murder of her father by agents of Defendants. The Court awarded Plaintiff $5 million in compensatory damages against Iran and MOIS, jointly and severally, and $300 million in punitive damages against MOIS. *See Rafii v. Islamic Republic of Iran*, Civ. No. 01-850(CKK), at 28-29 (D.D.C. Dec. 2, 2002) (memorandum opinion and order approving default judgment and awarding damages). In December 2002, and May 2003, Plaintiff served five writs of attachment seeking to enforce her December 2, 2002 judgment entered by this Court: (1) a December 30, 2002 writ served on the Department of Treasury; (2) a December 30, 2002 writ served on Bank of America; (3) a May 5, 2003 writ served on the Department of Defense; (4) a May 5, 2003 writ served on the Department of State; and (5) a May 5, 2003 writ served on the Department of Treasury. The United States subsequently moved to quash these writs in a series of filings entered in early 2003.

On March 31, 2004, the Court entered a Memorandum Opinion and Order expressing its belief that the United States's motion to quash all of Plaintiff's writs of attachment should be probably granted because the Court's December 2, 2002 judgment against Iran and MOIS was contrary to the District of Columbia Circuit Court of Appeals decision in *Cicippio-Pueleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004). However, in the alternative, the Court

conclusively found that sovereign immunity would bar attachment of the First and Second Accounts with the Bank of America and that the Third and Fourth Accounts with the bank were not within the possession or control of the United States and, therefore, not subject to attachment pursuant to Plaintiff's writ against the United States Department of Treasury. *See Rafii v. Islamic Republic of Iran*, Civ. No. 01-850, at 3 n.2 (D.D.C. Mar. 31, 2004) (memorandum opinion). The Court, however, did not vacate Plaintiff's judgment, and instead gave Plaintiff an opportunity to submit briefing as to why her judgment should not be vacated. Moreover, the reach of the Court's Order was further limited, as it only specifically addressed one of the five writs issued by Plaintiff. *See Rafii v. Islamic Republic of Iran*, Civ. No. 01-850 (D.D.C. Mar. 31, 2004) (order directing that "Plaintiff's Writ of Attachment served on the United States Department of Treasury is QUASHED").

As such, the Court's March 31, 2004 Order merely quashed (#1) the December 30, 2002 writ served on the Treasury Department upon a finding that the attachment was barred because of (1) the United States's sovereign immunity and (2) the fact that certain accounts were not in the possession or control of the United States. *See Rafii v. Islamic Republic of Iran*, Civ. No. 01-850 (D.D.C. Mar. 31, 2004) (order quashing Dec. 30, 2002, Treasury Department writ). The Court's decision did not rest upon a finding that *Cicippio-Puleo* compelled the quashing; rather, the Court merely raised the question vis-á-vis the remaining writs and invited briefing on that matter. *See id.*

Upon Plaintiff's explicit concession of any claim of attachment to the First and Second Accounts with the Bank of America, this Court issued an Order on January 11, 2005 quashing (#2) the December 30, 2002 writ of attachment served by Plaintiff on garnishee Bank of

America, N.A, with respect to the accounts denominated as the "First Account" and "Second Account" in the filings made by the parties and in the Answers to Interrogatories in Attachment filed by the Bank of America.  *See Rafii v. Islamic Republic of Iran*, Civ. No. 01-850 (D.D.C. Jan. 11, 2005) (order partially quashing writs with Bank of America).  After some confusion regarding the extent of the Court's January 11, 2005 Order, Plaintiff filed a February 17, 2005 Notice with this Court stating that "she consents to allowing the court to vacate without prejudice the May 5, 2003 writ served upon the Department of State with respect to the 'First Account' and 'Second Account' in the filings made by the parties and in Answers to Interrogatories in Attachment filed by the Bank of America." Pl.'s Notice at 1.  Accordingly, the Court also entered an Order partially quashing (#4) the May 5, 2003 writ of attachment served on the Department of State.  *See Rafii v. Islamic Republic of Iran*, Civ. No. 01-850 (D.D.C. Feb. 22, 2005) (order partially quashing May 5, 2003 writ with the Department of State).

By the Court's count, after taking into account this flurry of orders and legal briefing, two issues currently remain before it for resolution.  First, the Court must resolve the question raised by its March 31, 2004 Order:  Should Plaintiff's December 2, 2002 judgment against Iran and the MOIS be vacated in light of subsequent decisions undermining this Court's legal reasoning?  Second, the Court must resolve the issue of the remaining writs of attachment not dealt with in its earlier Orders.

## II: DISCUSSION

Given the two issues ripe for resolution, the Court shall first turn to the potential vacatur of Plaintiff's December 2, 2002 judgment against Iran and the MOIS, and then shall deal with the issue of the outstanding writs of attachment.

*A.     The Possible Vacatur of the December 2, 2002 Judgment*

1.     <u>Issues With the December 2, 2002 Final Judgment</u>

With the clarity of retrospective hindsight, two major problems exist with the legal reasoning contained within the Court's decision to enter judgment in Plaintiff's favor on December 2, 2002. First, consistent with numerous FSIA-related decisions at the time, *see, e.g.*, *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 114 (D.D.C. 2000); *Sutherland v. Islamic Republic of Iran*, 151 F .Supp. 2d 27, 53 (D.D.C. 2001); *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 138 (D.D.C. 2001), the Court awarded Plaintiff $300 million in punitive damages against the MOIS. *See Rafii v. Islamic Republic of Iran*, Civ. No. 01-850(CKK), at 23-29 (D.D.C. Dec. 2, 2002) (concluding that the MOIS fell outside the punitive damages bar against foreign states contained within 28 U.S.C. § 1606). However, in *Roeder v. Islamic Republic of Iran*, 333 F.3d 228 (D.C. Cir. 2003), issued seven months later, the D.C. Circuit concluded that a similar award of punitive damages was erroneous. *See id.* at 234-35. The *Roeder* court set down a categorical approach for determining if an entity should be considered the foreign state itself for the purposes of the Section 1606: "if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state." *Id.* at 234. Pursuant to this categorical test, the D.C. Circuit determined that because the core functions of the MOIS – Iran's Ministry of Foreign Affairs – are "governmental" in nature, the entity must be considered the foreign state of Iran itself rather than its agent. As such, pursuant to the plain language of Section 1606, the MOIS could not be liable for punitive damages in a FSIA-related action. *See id.* at 234-35.

Second, consistent with virtually every FSIA-related decision at that time, the Court assumed that Plaintiff could maintain a cause-of-action against Defendants Iran and the MOIS pursuant to the sovereign immunity exception provided under Section 1605(a)(7), *see* 28 U.S.C. § 1605(a)(7), and the Flatow Amendment, *see* 28 U.S.C. § 1605 note. *See Rafii v. Islamic Republic of Iran*, Civ. No. 01-850(CKK), at 15-17 (D.D.C. Dec. 2, 2002) (assuming a cause-of-action under Section 1605(a)(7) and the Flatow Amendment). Subsequent to the Court's December 2, 2002 entry of judgment in favor of Plaintiff, the D.C. Circuit issued two decisions that ultimately overturned such an assumption: (1) in *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004), the D.C. Circuit specifically held that "neither 28 U.S.C. § 1605(a)(7) nor the Flatow Amendment, nor the two considered in tandem, creates a private right of action against a foreign government," *id.* at 1033; and (2) in *Acree v. Republic of Iraq*, 370 F.3d 41 (D.C. Cir. 2004), the D.C. Circuit further held that plaintiffs cannot state a right of action under the "generic common law" or merely "allude[] to the traditional torts . . . in their generic form" but instead must "identify a particular cause of action arising out of a specific source of law," *id.* at 58-59 (quotation omitted). Subsequent decisions by judges within the United States District Court for the District of Columbia reveal that in FSIA-related cases similar to the one brought by Plaintiff in this case, state common and statutory law alone provide the causes-of-actions for claims by plaintiffs brought pursuant to the jurisdiction provided by Sections 1605(a)(7) and 1606. *See, e.g.*, *Holland v. Islamic Republic of Iran*, Civ. No. 01-1924 (D.D.C. October __, 2005) (Kotelly, J.); *Dammarell v. Islamic Republic of Iran*, Civ. No. 01-2224 (JDB), 2005 WL 756090 (D.D.C. Mar. 29, 2005) (Bates, J.) ("*Dammarell II*"); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105 (D.D.C. 2005) (Bates, J.); *Price v. Socialist People's*

*Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120 (D.D.C. July 26, 2005) (Lamberth, J.); *Wyatt v. Syrian Arab Republic*, Civ. No. 01-1628(RMU), --- F. Supp. 2d ----, 2005 WL 240152 (D.D.C. Sept. 30, 2005) (Urbina, J.).

    2.    <u>The Court's Power to Vacate a Final Judgment</u>

Given that this Court's Findings of Fact and Conclusions of Law entered on December 2, 2002 are premised upon legal reasoning now considered to be faulty, the question becomes: Does the Court have the power, as implied in this Court's March 31, 2004 Order, to vacate Plaintiff's default judgment obtained against Iran and the MOIS? A review of the Federal Rules of Civil Procedure and the relevant case law indicates that the judgment entered in favor of Plaintiff must stand.

"Default judgments are generally disfavored by courts, because entering and enforcing judgments as a penalty for delays in filing is often contrary to the fair administration of justice." *Int'l Painters & Allied Trades Union & Indus. Pension Fund v. H.W. Ellis Painting Co.*, 288 F. Supp. 2d 22, 25 (D.D.C. 2003) (citing *Jackson v. Beech*, 636 F.2d 831, 835 (D.C. Cir. 1980)). However, the decision whether to set aside a default judgment is nonetheless committed to the sound discretion of the trial court. *See Keegel v. Key West & Carribean Trading Co.*, 627 F.2d 372, 373 (D.C. Cir. 1980); *In re Chalasani*, 92 F.3d 1300, 1307 (2d Cir. 1996). Federal Rule of Civil Procedure 55(c) provides: "For good cause shown the court may set aside an entry of default and, if judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b)." Fed. R. Civ. P. 55(c). Therefore, while the court may set aside an entry of default with relative ease, as the standard for doing so is "a liberal one," *see United States v. $23,000 in United States Currency*, 356 F.3d 157, 164 (1st Cir. 2004) (citing *Coon v. Grenier*, 867 F.2d 73,

...
...
...

...
...

76 (1st Cir. 1989)), a court may only set aside a default judgment "in accordance with Rule 60(b)," *id.*  Because there was an actual default judgment entered in this case, the parameters set out in Rule 60(b) are determinative in the Court's inquiry.

Rule 60(b) provides that "[o]n motion and upon such terms as are just, the court may relieve a part or a party's legal representative from a final judgment, order, or proceeding" for several enumerated reasons.  Fed. R. Civ. P. 60(b).  To determine if a decision constitutes a final judgment, courts must ascertain whether it amounts to "a judgment in the sense that it is a decision upon a cognizable claim for relief, and whether it is 'final' in the sense that it is 'an ultimate disposition of an individual claim entered in the course of a multiple claims action.'" *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980) (citations omitted).  "While the Rule 60(b) standard is a more rigorous one because ' the concepts of finality . . . are more deeply implicated' in default judgment cases, courts consider the same criteria when applying either standard." *Int'l Painters*, 288 F. Supp. 2d at 26 (quoting *Enron Oil Co. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993); citing *CJC Holdings, Inc. v. Wright & Lato, Inc.*, 979 F.2d 60, 64 (5th Cir. 1992)).  The factors that must be balanced are whether: (1) the default was willful; (2) the alleged defense was meritorious; and (3) a set-aside would prejudice the plaintiff. *Jackson*, 636 F.2d at 835 (quoting *Keegel*, 627 F.2d at 374); *see also Resolution Trust Corp. v. Forest Grove*, 33 .3d 284, 288 (3d Cir. 1994).

In this case, it is clear that Defendants' default was culpable, willful, and without excuse.  As emphasized by the Second Circuit in *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242-244 (2d Cir. 1994), a sovereign is not relieved from the duty to defend cases and obey court orders even upon a mistaken belief that it enjoyed sovereign immunity.  Here, both Iran and

the MOIS were properly served with a copy of Plaintiff's complaint and chose not to answer or respond otherwise. Defendants, who are experienced litigants in the federal courts, *see Flatow v. Islamic Republic of Iran*, 999 F. Supp. 2d 1, 6 n.1 (D.D.C. 1998) ("The Islamic Republic of Iran is an experienced litigant in the United States federal court system generally and within this Circuit.") (citing cases), also made a decision not to appeal this Court's December 2, 2002 judgment. As such, there no question that Defendants' failure to respond to Plaintiff's suit and eventual default was intentional. Further, upon a review of the Court's December 2, 2002 findings of fact and conclusions of law, it is clear that Defendants are without a meritorious defense to Plaintiff's allegations; while it is clear that if Plaintiff's case were brought today, her damage award would be significantly reduced, Defendants' liability would not change. Finally, a set-aside at this late point would certainly prejudice Plaintiff, especially in light of her diligence in bringing her suit. Accordingly, none of the three factors traditionally considered within this Circuit favor displacing Plaintiff's hard-won default judgment.

However, despite the fact that Defendants have not entered this suit and have not filed any motion attempting to displace the default judgment entered against them, Rule 60(b) does allow a court to set aside a final judgment "upon such terms as are just." *See* Fed. R. Civ. P. 60(b). However, a court should cabin itself to the relief provided in Rule 60(b) when taking such a significant step. Rule 60(b) enumerates only six grounds for obtaining relief from a final judgment: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud or misconduct by the party; (4) the judgment is void; (5) the judgment has been satisfied or it is not longer equitable for the judgment to have forward application; or (6) any other reasoning justifying relief from the operation of the judgment. *Id.*

Reasons (1) through (3) are clearly inapplicable to the facts of this case; moreover, Rule 60(b) explicitly requires a motion to be made within one year of the final judgment to use those grounds as a mechanism to challenge the final judgment. *See id.* As such, the grounds for relief specified in Federal Rule of Civil Procedure 60(b)(1)-(3) have no relevance to these proceedings. Upon a review, reasons (4) through (6) are clearly inapplicable as well.

Pursuant to Rule 60(b)(4), a judgment may be vacated where the judgment is "void." *See* Fed. R. Civ. P. 60(b)(4). Importantly, "[a] judgment is void only if the issuing court lacked subject-matter jurisdiction over the action or if the judgment was otherwise entered in violation of due process." *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys.*, 385 F.3d 1206, 1226 (9th Cir. 2004) (citing *Tomlin v. McDaniel*, 865 F.2d 209, 210 (9th Cir. 1989)); *see also Adair v. England*, 209 F.R.D. 1, 4 (D.D.C. 2000); *Eberhardt v. Integrated Design & Constr. Co.*, 167 F.3d 861, 871 (4th Cir. 1999). "A judgment is not void because it is erroneous." 11 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2862, at 326 (2d ed. 1995); *United States v. Holtzman*, 762 F.2d 720, 72 (9th Cir. 1985). When this Court entered judgment in favor of Plaintiff on December 2, 2002, it had subject-matter jurisdiction over Plaintiff's claims, and the D.C. Circuit's subsequent decision in *Cicippio-Puleo* did not change this fact. *See Cicippio-Puleo*, 353 F.3d at 1034 ("[28 U.S.C. § 1605(a)(7)] confers subject-matter jurisdiction over [lawsuits for damages for certain enumerated acts of terrorism], but does not create a private right of action."). Moreover, in issuing the default judgment in favor of Plaintiff, this Court acted in accordance with due process. As such, Plaintiff's default judgment cannot be considered void, and cannot be vacated pursuant to Rule 60(b)(4). *See Cubic Def. Sys.*, 385 F.3d at 1225-26 (refusing to vacate

pre-*Cicippio-Puleo* decisions against Iran in the United States District Court for the District of Columbia under Rule 60(b)(4)).

Rule 60(b)(5) is applicable when the judgment is based on a prior action that has been satisfied, reversed, or vacated. *See NLRB v. Harris Teeter Supermarkets*, 215 F.3d 32, 35 (D.C. Cir. 2000). Plaintiff's judgment has certainly not been satisfied, and the application of Rule 60(b)(5) is otherwise limited to a judgment that has been reversed or otherwise vacated – based in the sense of res judicata, collateral estoppel, or somehow part of the same proceeding. *See supra* Wright et al., *Federal Practice and Procedure* § 2863, at 332-50; 7 J. Moore & J. Lucas, *Moore's Federal Practice* § 60.26[3] at 60-246 to 60-248 (1987); *see also Werner v. Cabo*, 731 F.2d 104, 207-08 (4th Cir. 1984). The relationship between the present judgment and the prior judgment must be closer than that of a later case relying on the precedent of an earlier case; rather, "the prior judgment must be a necessary element of the decision, giving rise, for example, to the cause of action or a successful defense." *Lubben v. Selective Serv. Sys. Local Bd. No. 27*, 453 F.2d 645, 650 (1st Cir. 1972). In this case, while the Court certainly cited to numerous other decisions in support of its ultimate legal conclusions provided in the December 2, 2002 final judgment, those cited cases amounted to no more than persuasive precedents in support of the Court's position; no single case provided a necessary element for the Court's decision. As such, the Court considers Section 60(b)(5) to be without applicability in this context.

Finally, Rule 60(b)(6) is a catch-all provision, meant to encompass circumstances not covered by Rule 60(b)'s other enumerated provisions. In doing so, it provides that a court may act to relieve a party from a final judgment for "any other reason justifying relief from the operation of the judgment." Fed. R. Civ. P. 60(b)(6). Importantly, Rule 60(b)(6) is available

only in cases evidencing "extraordinary circumstances."  *See, e.g.*, *Pioneer Inv. Serv. Co. v. Bunrswich Assoc.*, 507 U.S. 380, 393, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993); *Hess v. Cockrell*, 281 F.3d 212, 216 (5th Cir. 2002) (citing *Batts v. Tow-Motor Forklift Co.*, 66 F.3d 743, 747 (5th Cir. 1995)); *Martinez-McBean v. Gov't of the Virgin Islands*, 562 F.2d 908, 911 (3d Cir. 1977) (citing numerous cases); *see also supra* Wright et al., *Federal Practice and Procedure* § 2864, at 357.  When evaluating the circumstances surrounding Plaintiff's case, it is important to note that at the time Plaintiff obtained her judgment on December 2, 2002, the federal court decisions in the D.C. Circuit were uniform in finding there to be a federal cause-of-action against state sponsors of terrorism under Section 1605(a)(7) and the Flatow Amendment.  *See, e.g.*, *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 194 (D.D.C. 2003) ("*Dammarell I*"); *Cronin v. Islamic Republic of Iran*, 238 F. Supp. 2d 222, 231 (D.D.C. 2003); *Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 98-99 (D.D.C. 2003); *Kilburn v. Republic of Iran*, 277 F. Supp. 2d 24, 36-41 (D.D.C. 2003).  The *Cicippio-Puleo* decision that no federal cause-of-action exists under these statutory provisions represents a change or development in the judicial view of the law that existed at the time this Court granted judgment in favor of Plaintiff.

It is well-established that a change in the judicial view of the law, such as that enunciated by the D.C. Circuit in *Cicippio-Puleo*, is rarely – if ever – a proper basis for relief under Federal Rule of Civil Procedure 60(b)(6) from a final, unappealed judgment.  *See Agostini v. Felton*, 521 U.S. 203, 239, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) ("Intervening developments in the law by themselves rarely constitute the extraordinary circumstances required for relief under Rule 60(b)(6)."); *Johnson v. Ashcroft*, 223 F. Supp. 2d 116, 117 (D.D.C. 2002); *Ctr. for Nat'l Policy Review on Race & Urban Issues v. Richardson*, 534 F.2d 351, 352-53 (D.C. Cir. 1976) (per

curium); *DeWeerth v. Baldinger*, 38 F.3d 1266, 1272-73 (2d Cir. 1994); *Hess*, 281 F.3d at 216; *Martinez-McBean*, 562 F.2d at 911; J. Moore et al., *Federal Practice* § 60.48[5][b], at 60-181 (3d ed. 1997) (collecting cases).  The correction of legal errors committed by district courts is a function of the courts of appeal and does not warrant relief pursuant to Rule 60(b)(6).  *See Hess*, 281 F.3d at 216; *Martinez-McBean*, 562 F.2d at 911.  Here, Defendants had an opportunity to appeal and chose not to do so:  when a party makes a strategic decision not to appeal, it is not the job of district courts to use Rule 60(b)(6) to correct judgments that may have ultimately been proven to be legally erroneous.  *See Matarese v. LeFevre*, 801 F.2d 98, 107 (2d Cir. 1986), *cert. denied*, 480 U.S. 908, 106 S.Ct. 1353, 94 L.Ed.2d 523 (1987).

Accordingly, the Court concludes that it lacks the power, under either Federal Rule of Civil Procedure 55(c) or 60(b) to upset the final judgment awarded Plaintiff on December 2, 2002, and to do so otherwise would constitute an abuse of discretion.  As such, the Court shall overrule its March 31, 2004 preliminary "finding" that "the December 2, 2002, Default Judgment against the Islamic Republic of Iran and the Iran Ministry of Information and Security, in light of the District of Columbia Court of Appeal's decision in *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004), should be vacated."  *See Rafii v. Islamic Republic of Iran*, Civ. No. 01-850, at 3 n.2 (D.D.C. Mar. 31, 2004) (order).  Plaintiff's December 2, 2002 final judgment shall therefore stand.

B.   *The United States's Motion to Quash Plaintiff's Writs of Attachment*

After the flurry of Orders, motions, oppositions, and concessions regarding Plaintiff's writs of attachment issued in this case, two issues remain pending for the Court's resolution: (1) whether the Third and Fourth Accounts are subject to attachment by Plaintiff under the TRIA, and (2) whether the Iranian diplomatic and consular properties identified by Plaintiff that have been leased to third parties are subject to attachment under the TRIA. The Court shall deal with each issue in turn.

1.   The Third and Fourth Accounts

Given that Plaintiff's previous concessions have been limited specifically to the First and Second Accounts, as identified in the filings made by the parties and in the Answers to Interrogatories in Attachment filed by the Bank of America, the issue of Plaintiff's writs of attachment vis-á-vis the Third and Fourth Accounts remains pending. Upon an examination of the relevant facts surrounding this issue, the statutes and treaties implicated by Plaintiff's attachment, and the Executive Branch's interpretation of its obligations, the Court concludes that the Third and Fourth Accounts fall within the exclusion provided by Section 201(d) of the TRIA and therefore cannot be attached. As such, any writ of attachment by Plaintiff implicating the Third and Fourth Accounts must be quashed.

The TRIA enables judgment creditors to execute on or attach certain "blocked assets" to satisfy outstanding judgments. Specifically, Section 201(a) of the TRIA provides:

> IN GENERAL. – Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets

> of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

Pub. L. No. 107-297, § 201(a), 116 Stat. at 2337. A "blocked asset" is defined as "any asset seized or frozen by the United States under . . . the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702);" however, a "blocked asset" *does not include* property that "in the case of property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, or that enjoys equivalent privileges and immunities under the law of the United States, is being used exclusively for diplomatic and consular purposes." Pub. L. No. 107-297, § 201(d)(2), 116 Stat. at 2339-40. Upon a review, the Third and Fourth Accounts fall within this exclusion.

First, the Third and Fourth Accounts held by the Bank of America are clearly subject to the United States's obligations under the Vienna Conventions. Where, as was the case with Iran, diplomatic relations between the United States and a foreign country are severed, the United States has an international legal obligation under the Vienna Convention on Diplomatic Relations and the Vienna Convention on Consular Relations to protect the foreign country's diplomatic and consular missions, their premises, and their property in the United States. *See* Art. 45(a), Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, T.I.A.S. No. 7502 (Apr. 18, 1961); Art. 27(1)(a), Vienna Convention on Consular Relations, 21 U.S.T. 77, T.I.A.S. No. 6820 (Apr. 24, 1963).

As outlined in the Taylor Declaration, Gov't Mem. in Support of Mot. to Quash, Ex. 9 ("Taylor Decl."), the Third and Fourth Accounts were licensed for consular use shortly after the

issuance of the November 14, 1979 Blocking Order. *See* Taylor Decl. ¶¶ 28-29. A license was issued to the Continental Illinois National Bank & Trust to permit the Consulate General of Chicago to operate its account for the consulate's lawful operations in the United States. *Id.* ¶ 29 & Ex. 6. Continental National Bank & Trust was later acquired by Bank of America, passing this account ("the Third Account") to the Bank of America. *Id.* ¶ 29. A license was also issued to the Bank of America to permit the Consulate General of San Francisco to operate its accounts for the consulate's lawful official operations in the United States ("the Fourth Account"). *Id.* ¶ 29 & Ex. 7. As such, in light of the clear intent that these accounts were to be used for the official businesses of the consular offices with which they were associated, the Court concludes that they constitute "property of the consular post" as specified in the Vienna Conventions.

     Moreover, the Court is convinced that these accounts are being "used exclusively for consular and diplomatic purposes" for two reasons. First, while these accounts have been presumably inactive since the severance of diplomatic relations with Iran in 1980, they were not transferred upon the signing of the Algiers Accords. Instead, the Third and Fourth Accounts remain blocked by the United States in furtherance of its obligations to "protect and preserve" foreign government consular property in light of the failure of Iran and the United States to reach some other arrangement regarding their respective properties. *Id.* ¶¶ 6, 9-10, 36-37. Accordingly, it is clear that the United States government interprets its duty under the Vienna Conventions to continue to respect and protect these property until some further agreement. Second, Iran has filed a claim in the Iran-U.S. Claims Tribunal, which was created by the Algiers Accords, concerning its diplomatic and consular properties that remain in the United States. *Id.* ¶ 37. Importantly, this claim includes the Third and Fourth Accounts. *Id.* As such, dissipating

these properties prior to the resolution of this process would compromise these proceedings, exacerbate a diplomatic relations problem, and override part of the diplomatic functioning of the United States. *See id.* ¶¶ 13, 36-37 (noting that continued blocking of Iran's property in the United States is essential to preserving the United States's position both in the Tribunal proceedings and under the Vienna Conventions, and to ensuring the protection of its rights with regard to its own diplomatic and consular property in Iran).

The Court is aware that the court in *Weinstein v. Islamic Republic of Iran*, 274 F. Supp. 2d 53 (D.D.C. 2003), temporarily allowed the attachment of the funds located in the Third and Fourth Accounts, *see id.* at 61-62, though the writs at issue were later quashed on other grounds. The *Weinstein* court reasoned that these funds could be attached because: (1) it believed that the Vienna Conventions only required that the United States protect the "premises of the mission" itself, i.e., the buildings and land of the consulate, and not the kind of funds contained within the Third and Fourth Accounts, and (2) it concluded that the fact that the accounts were dormant and not presently in use for any diplomatic or consular purpose meant that they could not be exempt from the TRIA's definition of "blocked assets." *Id.* The Court finds both of these conclusions to be erroneous. First, the language of the Vienna Conventions clearly requires the protection of all diplomatic and consular *property* – not just the physical premises of the mission. *See* Art. 45(a), Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, T.I.A.S. No. 7502 ("If diplomatic relations are broken off between two States, or if a mission is permanently or temporarily recalled: (a) the receiving State must, even in the case of armed conflict, respect and protect the premises of the mission, *together with its property* and archives") (emphasis added); Art. 27(1)(a), Vienna Convention on Consular Relations, 21 U.S.T. 77, T.I.A.S. No. 6820 ("In the

event of a severance of consular relations between the two States: (a) the receiving State shall, even in the case of armed conflict, respect and protect the consular premises, *together with the property of the consular post* and the consular archives") (emphasis added). Second, even though dormant, the accounts are still "being used exclusively for diplomatic and consular purposes," Pub. L. No. 107-297, § 201(d)(2), 116 Stat. at 2339-40, as they are being maintained in a blocked status solely for the diplomatic purpose of "respect[ing]" and "protect[ing]" that property as required by the Vienna Conventions and preserving U.S. claims within Iran.

Given these facts, the Court concludes that because the Third and Fourth Accounts were previously used to fund Iran's consular operations and are now being "used" through their preservation to fulfill the United States's diplomatic purpose of complying with the Vienna Conventions and its obligations under the Algiers Accords, they are not subject to attachment under the TRIA. Accordingly, the funds at issue fall within the exemption provided by Section 201(d), and Plaintiff's remaining writs of attachment – as they implicate the Third and Fourth Accounts – must be quashed.

2. <u>Iranian Diplomatic and Consular Properties Leased to Third Parties</u>

In its initial motion to quash, the United States identified five Iranian diplomatic properties in the District of Columbia that are currently in the custody of the Department of State, and which would be subject to Plaintiff's writ of attachment served on the Department of State. Of these five properties, four are leased to third parties while the other remains a vacant lot. Taylor Decl. ¶¶ 15-19. Plaintiff claims that these assets fall within the attachable category of "blocked assets" because (1) they fall within Executive Order 12170 and (2) the fact that they are being used by third parties – i.e., for "non-diplomatic purposes" – means that these properties

therefore fall outside of the "diplomatic purposes" exemption provided in Section 201(d) of the TRIA. As such, Plaintiff asserts that these properties are ripe for attachment.

Upon a review of the issues, the Court concludes that these properties in question are "being used exclusively for diplomatic or consular purposes," Pub. L. No. 107-297, § 201(d)(2), 116 Stat. at 2339-40, and are therefore exempt from attachment under the TRIA despite the fact that some of these properties are being rented to third-parties. Importantly, the United States is charged under the Vienna Conventions with protecting and respecting Iranian diplomatic property despite the breakdown of relations between the two countries. In order to do so, the Office of Foreign Missions – the agency charged with carrying out this responsibility – has determined that the best course of action would be to lease out or hold these properties because in renting and/or holding these properties, as opposed to selling them, the United States accomplishes at least two different purposes: (1) it ensures that the properties remain within its ultimate control, protecting the property for a presumptive future time when Iran and the United States resume diplomatic and consular relations; and (2) it uses the funds earned to carry out routine maintenance on the properties, thereby "respect[ing] and protect[ing]" the property as required. Accordingly, even though some of the properties identified have been leased to third-parties, ultimately they are still being used "exclusively for diplomatic purposes" and thereby fall outside of the definition of "blocked assets" for the purposes of the TRIA. As such, Plaintiff's writs of attachment on these and similar properties must be quashed. *See Hegna v. Islamic Republic of Iran*, 376 F.3d 485, 493-96 (5th Cir. 2004) (holding that although the United States has leased Iranian property to "private parties and has used some of those rental proceeds to satisfy domestically-created obligations, it has used the consular residence 'exclusively for

diplomatic or consular purposes'"); *Hegna v. Islamic Republic of Iran*, 287 F. Supp. 2d 608, 609-11 (D.Md. 2003) (same); *Mousa v. Islamic Republic of Iran*, Civ. No. 00-2096 (D.D.C. Nov. 5, 2003) (Bryant, J.) (same); *Elahi v. Islamic Republic of Iran*, Civ. No. 99-2082, 2003 U.S. Dist. LEXIS 25813 (D.D.C. July 22, 2003) (same); *Hegna v. Islamic Republic of Iran*, Civ. No. 00-716, 2004 U.S. Dist. LEXIS 15947 (D.D.C. Mar. 22, 2004) (same).

### III: CONCLUSION

For the reasons set forth above, (1) the Court holds that the judgment entered in favor of Plaintiff on December 2, 2002 shall stand, and any contrary language previously used by this Court suggesting that such a judgment might be vacated is hereby rendered inoperative; and (2) the Court rules that to the extent that its previous Orders had not fully granted [54] the United States's Third Motion to Quash, [54] the United States's Third Motion to Quash is GRANTED in full and all identified writs of attachment are QUASHED.  An Order accompanies this Memorandum Opinion.

Date:   October 25, 2005

                                                    */s/*
                                                COLLEEN KOLLAR-KOTELLY
                                                United States District Judge